THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JUAN HERNANDEZ, Defendant-Appellant.

First District (2nd Division)    No. 81-65

Opinion filed April 6, 1982.

James J. Doherty, Public Defender, of Chicago (Ina S. Marks, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, James Koch, and Rhoda W. Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DOWNING delivered the opinion of the court:

Defendant Juan Hernandez was indicted on two counts for the murder of Jaime Mora (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1), (a)(2)), two counts of armed violence based upon the murder of Mora and the aggravated battery by gunshot wound of Tammie Sandel (Ill. Rev. Stat. 1977,

ch. 38, par. 33A—2), and two counts of aggravated battery based upon the shooting of Sandel (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a), (b)(1)). Motions to quash defendant's arrest and to suppress a confession taken thereafter were denied. A jury found defendant guilty on one count each of murder, armed violence, and aggravated battery. The trial court sentenced defendant to serve 25 years for the murder of Mora and 20 years for the armed violence upon Sandel. The court considered the aggravated battery convictions merged into the armed violence conviction.

Defendant argues on appeal (1) the trial court erred in denying his motions to quash his arrest and to suppress a confession he made thereafter; (2) the State failed to prove him legally accountable for the crimes committed on the victims; and (3) he was denied a fair trial by allegedly improper statements made by the State during its closing and rebuttal arguments to the jury.

On July 6, 1979, at about 11 p.m., Jaime Mora was shot to death and Tammie Sandel was gravely wounded while standing at the intersection of 38th Street and Washtenaw Avenue in Chicago. The gunman was allegedly Mario Mata, who was indicted with defendant but separately tried. Defendant drove the car from which the shots were fired. Defendant was arrested at the home of his girlfriend in Chicago at 6 a.m. the following day.

Defendant's initial motion to suppress rested upon his contention that his confession was involuntary. Arresting officer (Chicago police department) Moser related he arrested defendant at the home of Linda Dunleavy at 6 a.m. on July 7, 1979, in the company of two other officers. Defendant was read his *Miranda* rights at the time of his arrest and at the police station. Defendant acknowledged understanding those rights. Defendant agreed to give a statement. An assistant State's Attorney was called. He questioned defendant after reading the latter his rights. Defendant gave a 14-page written statement, which he signed. On cross-examination, Moser related defendant was handcuffed to the wall while detained and questioned. Moser did not see defendant beaten while in custody. Defendant did not complain to Moser about his treatment.

Assistant State's Attorney Cavanaugh questioned defendant at the police station. He made no promises or threats to defendant. Cavanaugh noticed nothing unusual about defendant's appearance. Defendant did not complain about his treatment. On cross-examination, Cavanaugh admitted defendant stated he was treated well "except for two guys [police officers]." Cavanaugh did not inquire further on that matter.

Officer Cigielski, Moser's partner, corroborated Moser's version of the events. No threats or promises were made to defendant. Defendant was not abused.

A picture of defendant taken after he gave the statement was ad-

mitted into evidence. It showed no indications defendant had been beaten.

Defendant related he was beaten by two policemen while in the detention room. One smacked his head into the wall, while another punched his arms and chest. After the assistant State's Attorney questioned him, policemen offered defendant a deal if he would talk. Eventually, defendant was forced to give a statement. On cross-examination, defendant stated he looked over the written statement before signing it, but did not read it.

The trial court found defendant's version of the events to be non-credible and denied the motion to suppress.

The case proceeded to trial. There, one of the witnesses was Officer Cigielski. He had been assigned to investigate the shootings of Jaime Mora and Tammie Sandel. He interviewed six individuals at the scene and learned the shots had been fired from a brown station wagon. Cigielski was directed to the residence of Linda Dunleavy. There, he spotted a brown station wagon parked in the street and saw a woman looking out a second floor window. Cigielski went to the second floor, knocked, and received no response. He finally kicked in the door and asked for defendant or Dunleavy. Cigielski conducted a search after being told they were not there. He found the two hidden in a closet in the back of the house. Also in the closet was a shotgun. Defendant was arrested. The time was 6 a.m. At the station, defendant admitted to Cigielski he had driven the car involved in the incident.

Later in the proceedings, the trial was disrupted and a mistrial declared at defendant's request. Defendant then filed a motion to quash the arrest based upon the additional information contained in Cigielski's testimony. The trial court denied this motion.

At the second trial, victim Sandel testified to the events on the night of July 6, 1979. She was standing on a street corner with Mora and another man. A brown station wagon drove by. Some time later, the same car approached and stopped. There were four persons in the car. Defendant was driving, and Mario Mata was seated behind him. Sandel knew both men. After the car stopped, a rifle came out the window where Mata was sitting. Sandel's two companions ran. Sandel heard about eight shots. She began to walk away and was shot in the back. The car then drove away, with defendant at the wheel.

Another witness testified to the events of the shooting, which he observed from several hundred feet away. He could not identify the passengers in the car, but saw both Mora and Sandel lying wounded on the ground. He had seen defendant drive the car on earlier occasions.

Other police officers involved in the investigation testified, and Officer Cigielski repeated his testimony from the earlier trial. Assistant

State's Attorney Cavanaugh also testified as he had at the suppression hearing.

Defendant took the stand in his own behalf. He had been out driving on the night in question with his brother. He picked up his friend, Mario Mata. Defendant then drove over to pick up Linda Dunleavy, his girl-friend. As he approached the corner of 38th Street and Washtenaw Avenue, shots rang out from his car. Defendant knew there was a gun in his car. Defendant repeated his testimony concerning his version of his arrest and interrogation. On cross-examination, defendant stated the gun had been put into his car by his friend. Defendant had moved the gun to under the driver's seat. He took the gun up to Dunleavy's house after dropping off Mata. Defendant claimed he was unaware the gun was used to shoot anyone that night. He admitted driving the car at the time in question.

Also introduced into evidence was the statement defendant gave to assistant State's Attorney Cavanaugh. In that statement, defendant related he had passed the site in question in his car with Mata and another while driving to pick up Dunleavy. He recognized Jaime Mora standing on the corner. Defendant knew there was trouble between Mora and Mata. Mata said, "Let's get them later." They drove to Dunleavy's house. Mata then said they should "get" the men on the corner, meaning he wanted to shoot at them or beat them up. Defendant finally agreed to do so. He drove to the site and stopped the car. Mata pulled out the gun, and the group on the corner split up and ran. Defendant heard shots and saw Mora fall. Defendant then drove away. This statement was initialed on each page by defendant and signed on the final page.

The jury found defendant guilty on the theory of accountability for the murder of Mora and aggravated battery and armed violence upon Sandel.

I

Defendant asserts the trial court erred in denying his motions to quash his arrest and suppress his statements.

A.

Defendant moved to quash his arrest on the basis that he was improperly arrested without a warrant in the home of his girlfriend. On appeal, defendant relies principally on the holding of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, in arguing the trial court erred in denying the motion.

As argued by the State, *Payton* is inapplicable to the present circumstances. A careful reading of *Payton* and its Illinois counterpart, *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, demonstrates that the holdings of those cases were concerned solely with the specific fact

situation in which police make a warrantless entry into the *defendant's* home for the purpose of effectuating his arrest. Since defendant was not arrested in his own home, the rationale underlying the *Payton* and *Abney* holdings does not directly apply here.

Our research indicates Illinois reviewing courts have apparently not yet directly addressed the question of what the proper police procedure is when arresting a suspect in the residence of a third person. In *People v. Grant* (1982), 104 Ill. App. 3d 551, 432 N.E.2d 1200, we assumed without discussion that such an arrest could be made without a warrant so long as the record contained adequate proof of the presence of exigent circumstances justifying such warrantless police activity. This assumption coincides with the holding of the only other case on point we have discovered. In *United States v. Williams* (3d Cir. 1979), 612 F.2d 735, 738, *cert. denied* (1980), 445 U.S. 934, 63 L. Ed. 2d 770, 100 S. Ct. 1328, which preceded and anticipated the *Payton* rationale, it was held that the protections of the fourth amendment extend to a defendant arrested in the residence of a third person. The *Williams* court held that there must be exigent circumstances present to validate a warrantless arrest in such a situation. 612 F.2d 735, 738.

We have considered the competing interests involved in this situation and agree with the *Grant* and *Williams* decisions. The interests involved in such circumstances are threefold. First, there is the strong interest in maintaining effective law enforcement by not unduly restricting the ability of law personnel to apprehend legitimate criminal suspects. Second is the strong fourth amendment interest of the third party, whose home is invaded in such circumstances. Third is the fourth amendment interest of the suspect, although this interest is certainly not as strong as in a situation where the suspect is within the confines of his own home. Compare *United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820, with *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

■■ As a preliminary matter, we note defendant does not contest the issue of whether the arresting officers had probable cause to arrest him in this case. Starting from that underlying premise, we now hold that there must be proof of exigent circumstances in order to validate the warrantless arrest of a suspect in the home of a third person. Where exigent circumstances are lacking, the police must procure a warrant in order to protect the fourth amendment rights at stake.[1]

---

[1] We do not decide whether the warrant required in the absence of exigent circumstances should be an arrest warrant, which would be sufficient under *Payton*, or a search warrant. We note that the Supreme Court's decision in *Steagald v. United States* (1981), 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642, although not directly on point, would seem to presage the requirement of a search warrant due to the multiple fourth amendment interests involved.

■■ The factors to be analyzed in determining whether exigent circumstances were present have been presented often before and need no further recitation here. (See *People v. Henderson* (1981), 96 Ill. App. 3d 232, 236, 421 N.E.2d 219.) Applying the present facts to those elements, we first note the crimes involved were significantly violent: the apparently unprovoked shooting death of one person and grave wounding of another. Because of this, the police could reasonably believe defendant was armed and dangerous at the time of his arrest. (Indeed, in hindsight, the facts show defendant had the murder weapon in his possession when arrested.) As noted, and conceded by defendant, there was clear probable cause to effect defendant's arrest. The record shows a car reasonably thought to be defendant's was parked outside the residence in which the arrest took place. Thus, the police had strong reason to believe defendant was in the premises. Further, we find no unduly long delay between the officers' awareness of defendant's location and his arrest, in which a warrant could have been obtained. The shooting occurred at 11 p.m.; the arrest took place at 6 the following morning. It appears the arresting officers interviewed witnesses, followed their leads, and proceeded to seize defendant as soon as information as to his whereabouts was available.

In sum, the record on the whole strongly demonstrates the presence of exigent circumstances for the arrest of defendant in the home of his girlfriend. Consequently, the absence of a warrant did not serve to vitiate that police action. Since defendant's arrest was proper, his statement cannot be suppressed on this basis.

### B.

Defendant contends his confession must be suppressed because it resulted from physical and mental coercion and was involuntary.

■■ When an accused makes a statement to law enforcement personnel in circumstances which indicate that the former's will was overborne or the statement was not a product of a rational intellect, that statement is involuntary and thus inadmissible at trial. For a statement to be voluntary and thus admissible, there must be no compulsion or inducement of any sort. (*People v. Kavinsky* (1980), 91 Ill. App. 3d 784, 790, 414 N.E.2d 1206, *appeal denied* (1981), 83 Ill. 2d 572.) The burden is upon the State to establish voluntariness of a confession by a preponderance of the evidence, and the State has the burden of producing all persons whose testimony would be material on the issue, or to explain their absence. The trial court's determination will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Lewis* (1979), 75 Ill. App. 3d 259, 278, 393 N.E.2d 1098, *appeal denied* (1979), 79 Ill. 2d 623.

■■ Our review of the record convinces us the trial court properly denied the suppression motion based on this ground. We agree defendant's story

of physical and mental coercion lacks credibility in the face of the remainder of the evidence concerning the circumstances of his confession.

## II

Defendant argues the State failed to prove beyond a reasonable doubt he was responsible for the shootings of the victims by Mario Mata. ■■ The record is clear defendant did not fire the gun at the victims here. Clearly, defendant's only overt act was to drive the car from which the gunfire came, to and from the scene. In order to validly convict defendant of murder and armed violence in these circumstances, it was necessary that the State prove beyond a reasonable doubt that defendant solicited, aided, abetted, agreed to or attempted to aid Mata in the planning or commission of the shootings, that he so participated either before or during the commission of the offense, and that he did so with the concurrent specific intent to promote or facilitate the offense. Defendant's mere presence at the scene was insufficient to establish guilt under the accountability theory. *People v. Shaw* (1981), 98 Ill. App. 3d 682, 685, 424 N.E.2d 834; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 68, 405 N.E.2d 1121, *appeal denied* (1980), 81 Ill. 2d 597.

■■ However, we view the record as adequate to support defendant's conviction. That he aided, abetted, and participated in the shootings of Mora and Sandel cannot really be questioned. The 14-page statement he gave on the day of his arrest clearly indicates defendant's active participation in the crimes, which were obviously preconceived, cold-blooded actions rather than the spontaneous events suggested by defendant.

## III

Defendant claims he was denied a fair trial by four statements made by the State during its closing and rebuttal arguments to the jury.

We have reviewed those statements and the circumstances in which they arose. There is no need to recite them here. All of the comments to which defendant now objects were within the scope of proper closing argument. Defendant received an eminently fair trial and his convictions stand.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.