THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES JONES *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—85-2846, 1—85—2861,
1—86—0534 cons.

Opinion filed May 19, 1989.—Modified on denial of rehearing July 7, 1989.—
Modified pursuant to supervisory order September 1, 1989.

Randolph N. Stone, Public Defender, of Chicago, for appellants Charles Jones and Charles Martin.

Michael J. Pelletier and Thomas Long, both of State Appellate Defender's Office, of Chicago, for other appellant.

Richard M. Daley, State's Attorney, of Chicago, for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendants, Charles Jones, Kenneth Henson, and Charles Martin, were convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(1)), two counts of attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1), home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(1)), and three counts of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), and were sentenced to 60 years' imprisonment. Each defendant filed a timely notice of appeal and the cases were consolidated in this court. We will address the following four issues on appeal: (1) whether each defendant's motion to quash arrest and suppress statements was denied in error; (2) whether the admission of bloodstain identification testimony based on the process of electrophoresis denied Henson a fair trial; (3) whether each defendant was proven guilty beyond a reasonable doubt of the attempted murder of Mr. L.; and (4) whether Martin was proven guilty beyond a reasonable doubt of aggravated criminal sexual assault. As to Henson and Martin, we affirm in part, reverse in part, and remand for resentencing. As to Jones, we reverse and remand for new trial.

Prior to the trial of this case, each defendant moved to quash his arrest and suppress statements, and each motion was denied by the trial court. Each defendant waived his right to a jury trial, and the evidence at trial established the following facts.

The State presented evidence that on December 17, 1984, at approximately 7:30 p.m., the three defendants, Jones, Henson, and Martin, forced their entry into an apartment while Mr. L., his wife Mrs. L., and his nine-year-old daughter R.L. were home. One defendant was carrying a gun and another was carrying a knife. When defendants kicked down the door, Mrs. L. was thrown on her back on the kitchen floor. She screamed and was told to "shut up" or she would be killed. While lying on the floor, she was stabbed in the back and

was threatened, "Shut up bitch or I'll kill you."

Upon entering the apartment, Martin hit Mr. L. in the head with the gun and Mr. L.'s hands were tied behind his back while he was lying in the hallway. Martin asked Mr. L. for his money. He was told if he did not cooperate, he and his family would be killed.

Two of the defendants forced Mrs. L. into the bedroom, where she was raped by a person she could not identify. She was also forced to perform oral sex on Jones, during which time she scratched him in the groin area. Henson then raped her while Jones beat her in the head with a cribbage board and the gun. Jones also put the gun in her mouth and asked her how she would like to be "popped" that way. After Henson raped her, Jones put the gun in her vagina and asked how she would like to be killed that way. Jones raped her again. Mrs. L. testified she was not sure whether Martin was involved in the attack. She also testified that she heard the defendants refer to each other as BeeBee,[1] Fork, and Chuck.

During the time Mrs. L. was being raped, Mr. L. was hit several times in the head with the gun and one of the men stomped on his head. He was repeatedly kicked and hit with the gun. Mr. L. testified that defendants repeatedly stated, "I don't believe you only have this much money in the house. You have to have more." He was dragged into the bathroom, where he could hear Mrs. L. crying in the bedroom, and defendants stated, "Shut up bitch. We are going to kill you." Mr. L. testified that he heard Mrs. L. beg, "Don't kill my family."

During the time Mr. L. was being beaten, Jones was in the living room with R.L. He took R.L.'s pants off and sexually assaulted her with his finger. Afterward he threw her next to her father in the bathroom. While lying in the bathroom, R.L. told her father that the defendants told her if she moved, they would kill her. Mr. L. and R.L. were repeatedly kicked and beaten while in the bathroom. Mr. L. testified he heard two of the defendants arguing in the hallway. One stated they should kill the family and the other disagreed. One of the defendants came in the bathroom, held a gun to R.L.'s head, and told Mr. L. he would kill R.L. if he did not show him the key to their car. Mr. L. showed him the key and told him where the car was parked. Martin and Jones removed property from the apartment and loaded it into the car.

---

[1]The nickname BeeBee is also transcribed at various points in the record as Bay-Bay and Bebe. There is no dispute that those names refer to Henson. For clarity, we will use the spelling BeeBee.

Mrs. L. testified that after she was attacked, she was left alone in the bedroom. Henson returned shortly thereafter and placed a gun "nonthreateningly" on her chest. He told her, "Don't worry. We didn't hurt your baby. I am sorry all this happened. I will make sure we get caught." When she heard footsteps leaving the apartment, she wrapped her shirt around her stab wounds to stop the bleeding and telephoned the police. She passed out and was taken to the hospital by ambulance.

Mrs. L. was in critical condition when she arrived at the hospital and required immediate surgery. The stab wounds caused extensive internal bleeding. One stab wound cut off the blood supply to her spleen and it had to be removed. The other stab wound missed her abdominal aorta by three millimeters. She had been beaten in the face and head and had multiple bruises on the rest of her body. She was in the hospital recovering from her injuries and surgery for eight days. Mr. L. suffered several lacerations to the head and a broken nose, and his injuries required a total of 25 stitches, some to the head and some to the nose. R.L. had bleeding wounds on her head and bruises on her back and legs. She also had a bruise in the shape of a shoe on her stomach. An examination revealed a bruise, a laceration, and blood in her vagina.

After a police investigation, defendants were arrested and each gave statements to the police which were admitted into evidence at trial. The trial court admitted each statement only against the defendant who made it. The statements substantially corroborated the State's evidence.

Martin gave an oral statement admitting that he broke into the apartment with Henson, whose nickname was BeeBee or BayBay, and Jones, whose nickname was Folks or Fork. Martin was carrying a gun and Jones was carrying a knife. Martin gave the gun to Henson, who was with Mrs. L. Shortly after entering the apartment, Martin went downstairs to watch for police. When he returned, he heard Henson say, "[T]ake off your clothes." When he reentered the apartment he saw Henson raping Mrs. L. Jones told R.L. to take off her clothes and he put his finger in her vagina. Jones put R.L. in the bathroom, where Mr. L. was tied up lying on the floor. Mr. L. was bloody. Jones struck Mr. L. with the gun several times and also struck R.L. Martin said they needed a car to remove property from the apartment, and Jones struck Mr. L. several more times, demanding his car keys. Martin waited in the car while Jones brought the property down from the apartment. Martin asked where Henson was and Jones said, "He is still up messing with the woman." They brought the property to the

apartment of one of Jones' friends.

Henson gave a written statement admitting he broke into the apartment with Martin and Jones, whom he knew as Jake or Pitchfork. Henson's nickname was BeeBee. Martin hit Mr. L. in the head with the gun and Henson took his wallet. Jones, who had a knife, took Mrs. L. into the bedroom. Martin gave Jones the gun, and Jones hit Mrs. L. in the head with it. Jones raped her and forced her to perform oral sex. Henson then raped her. Jones brought R.L. in the bathroom and hit Mr. L. in the head with the gun several times. Martin and Jones took the property out of the apartment and to the car. Henson left the apartment shortly thereafter, and when he found Martin and Jones, they divided the $25 they took from Mr. L.'s wallet.

Jones also gave a written statement admitting he broke into the apartment with Martin and Henson, whose nickname was BeeBee. Jones' nicknames were Pitchfork, Fork, and Chuck. Martin hit Mr. L. in the head with the gun. Henson took $25 from Mr. L.'s wallet and tied him up. Jones, who was carrying a knife, took Mrs. L. in the bedroom and raped her. He also forced her to perform oral sex. Jones hit her in the head with the gun. While Henson was holding Mrs. L., Jones stabbed her in the back. In the living room, Jones took R.L.'s pants off and Martin covered her head with a pillow. Jones put his finger in her vagina. Jones took her into the bathroom and put her on the floor next to Mr. L. Jones hit Mr. L. with the gun several times when he would not cooperate. Jones also hit R.L. with the gun. Martin and Jones took the property from the apartment and to the car. Henson was raping Mrs. L. at this time. Martin and Jones later met Henson and they divided the $25.

After the close of the State's case, defendants moved for a directed finding which was denied. Each defendant rested without presenting evidence. Defendants were convicted of aggravated criminal sexual assault, attempted murder, home invasion, and armed robbery, and were sentenced to 60 years' imprisonment. Defendants' motions for new trial were denied and each filed a timely notice of appeal.

OPINION

I

The first issue presented is whether each defendant's motion to quash arrest and suppress statements was denied in error. The facts of each defendant's motion will be addressed separately.

HENSON'S MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

Prior to trial, Henson moved to quash his arrest and suppress statements based on his warrantless arrest. The trial court denied the motion finding that exigent circumstances justified his arrest without a warrant.

Henson was arrested at approximately midnight on December 18, 1984, the day after the crime occurred. Detectives investigating the crime learned that the gun found at the scene, a .41 caliber Magnum, was stolen in an unrelated burglary Martin may have committed. At approximately 7 or 8 p.m. on December 18, Martin's mother told them that Martin was with his friend known to her as BeeBee the night of the crime. Martin and BeeBee left her apartment that night at approximately the time the crime occurred. Martin's mother gave the police a physical description of BeeBee. BeeBee's uncle, James Hardiman, also told them he saw Martin and BeeBee together at the apartment that evening. Hardiman told the detectives that Martin was known to carry a .41 caliber Magnum gun. When BeeBee returned later upset and looking for Martin, Hardiman noticed he appeared to have blood on his pants.

Later in the evening, at approximately 11 p.m., Hardiman gave the detectives the telephone number of a relative where BeeBee was staying, and the detectives traced the address through telephone records. Hardiman was taken to the police station and agreed to telephone BeeBee at the relative's home in an attempt to persuade him to surrender to police. Five detectives went to the apartment building where BeeBee was staying, two secured the back exit, two secured the front exit, and one stayed at the police car maintaining radio contact with the police station. The detectives were notified shortly after Hardiman made the telephone call. At that time, the detectives were told that Hardiman spoke with BeeBee. A few minutes later, a man whom the detectives believed was BeeBee came out of the apartment building. The two detectives at the front exit had their guns drawn and announced their office. The man ran back into the building. The detectives forcibly opened the front door of the apartment building and followed the man to the second floor. There was only one apartment door on the second floor. They knocked and a woman answered through the closed door. They told her they were the police and they were looking for BeeBee. She opened the door and pointed to the back of the apartment. The detectives entered and confronted five or six men in one of the bedrooms. They conducted a pat down search of each man and asked their names. Eventually, Henson admitted he was BeeBee. He was handcuffed, arrested, and taken to the police station.

The other men were also brought to the station.

Henson's witnesses for the motion to quash hearing were those people who were in the apartment when the police arrived. Henson's aunt and uncle, Eafter and Robert Wofford, lived in the apartment with four of their children. Eafter Wofford testified that her cousin, Fred Williams, left her apartment at approximately 11:55 p.m. to go to the grocery store and that after he left, her son, Larry, received the telephone call from Hardiman. Larry testified that Hardiman asked whether BeeBee was there. Larry asked him to hold on but Hardiman said, "Just tell him to give himself up. They are coming to get him," and hung up the telephone.

Williams testified that when he went down to the front door of the apartment building and opened it, he saw a man with a gun who said, "Don't move or I'll blow your head off." Williams closed the front door and ran back up the stairs and into the apartment.

Eafter Wofford testified that two to three minutes after Williams returned, there was a knock on the door. When she asked who was there, a man said, "Open the door." This exchange occurred two or three more times until the man said, "Police. If you don't open this door, I'm going to kick it down." She opened the door and three plainclothes police officers entered the apartment with their guns drawn. They asked her the location of the man who ran up the stairs and into the apartment, and she called for Williams. The police handcuffed Williams and asked who BeeBee was. Henson testified he identified himself as BeeBee and an officer put a gun to his head, handcuffed him, and called him obscene names. Henson was taken to the police station.

The trial court found that based on the testimony presented at the motion to quash hearing, exigent circumstances allowed the police to arrest Henson without a warrant.

■ When exigent circumstances are present, the police can enter a private residence to arrest a suspect for a felony without a warrant. (See *Steagald v. United States* (1981), 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642; *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) As the Illinois Supreme Court has stated, "*Payton* and *Steagald* combined teach us that the police should, absent exigent circumstances, seek either an arrest warrant or a search warrant when they plan to arrest a suspect in *any* dwelling." (Emphasis in original.) (*People v. White* (1987), 117 Ill. 2d 194, 210, 512 N.E.2d 677, 682.) In the present case, the trial court did not make a specific ruling as to whether Henson was arrested in his home. Both parties argue the point; however, it is irrelevant whether Henson was

arrested in his home or that of a third party because the trial court found exigent circumstances were present. See *People v. Hernandez* (1982), 105 Ill. App. 3d 501, 434 N.E.2d 532.

██ ▌ The following factors are relevant in determining whether exigent circumstances existed: (1) whether the crime under investigation was recently committed; (2) whether there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) whether a serious offense was involved, particularly a crime of violence; (4) whether there was a reasonable belief that the suspect was armed; (5) whether the police officers were acting on a clear showing of probable cause; (6) whether there was a likelihood that the suspect would escape if he was not quickly apprehended; (7) whether there was strong reason to believe the suspect was in the premises; and (8) whether the police entry was made peaceably, although made without consent. (*People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.) The guiding principle is whether the police officers acted reasonably based on the facts that were known to them at the time. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369.) The trial court's finding with regard to a motion to quash arrest will not be disturbed on appeal absent manifest error. *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.

Defendant urges this court to find that the trial court erred in finding that exigent circumstances justified his warrantless arrest, relying on *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677. In *White*, two murders were committed on August 12, 1982. On August 19, two detectives were assigned to investigate the murders. Based on information contained in police reports, they attempted to locate defendant but were unsuccessful. On August 20, the detectives went off duty and did not resume their investigation until August 23. Apparently during the period the detectives were off duty, no other police officers were assigned to continue the investigation. On August 23, the detectives learned defendant was staying at his brother's apartment. Without the brother's consent, the detectives entered the apartment with their guns drawn. They spoke with defendant for several minutes and allowed him to speak with his mother, who urged him to go with the police and tell the truth. Defendant agreed to go with the officers and was not placed in handcuffs. Defendant was not formally placed under arrest until he was in custody for 45 hours.

The Illinois Supreme Court in *White* found that under those circumstances, exigent circumstances did not exist relying on the following facts. Although the police learned of defendant's involvement immediately after the murders, he was not arrested until two weeks

later. Also, the investigation was unnecessarily delayed three days because the officers were off duty. Additionally, the State's claim that the police believed defendant was dangerous was contradicted by the fact that the police did not place defendant in handcuffs when they took him to the station.

■■ The case at bar involves materially different facts than presented in *White*. Henson was arrested approximately 28 hours after the crime occurred, and the police learned of Henson's involvement approximately four hours before he was arrested. The record establishes that detectives were continuously investigating the crime immediately after it was committed. The crucial distinction is that the detectives in the present case saw a person whom they believed was Henson attempt to flee from them and back into the apartment. Additionally, when the police found Henson, he was immediately arrested and placed in handcuffs.

Defendant focuses on four factors enumerated in *White* to support his argument that the trial court erred when it found exigent circumstances justified his arrest. First, he argues there was an unnecessary delay from the time police officers had probable cause to arrest Henson until the time the arrest took place. (See *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.) There was a span of approximately four hours from the time Henson was implicated in the crime until he was arrested at midnight. The police learned of his location at approximately 11 p.m. The exigent circumstances arose when the officers saw a man they believed was Henson run back into the apartment building. At that point, immediate action was justified and the police officers were not required to obtain a warrant before entering the premises.

Second, defendant claims there was no evidence that he was armed. However, both a knife and gun were used in the crime and only the gun was recovered by police prior to defendant's arrest. The violent nature of the crime coupled with the fact that the knife was not yet recovered supports the likelihood that defendant was armed.

Third, defendant claims that there was no evidence he was likely to escape; however, after Hardiman telephoned the apartment, the police encountered a man whom they believed was Henson flee from them.

Fourth, defendant argues the police officers' entry into the apartment was not peaceful. The police forced open the entry door on the street level to the apartment building only after they saw a man they thought was Henson flee. When they reached the apartment on the second floor, they knocked on the door and announced their office.

The testimony was conflicting as to whether the police threatened to kick down the door. The police entered with their guns drawn. Henson relies on *People v. Wormack* (1980), 91 Ill. App. 3d 169, 414 N.E.2d 177, where the reviewing court disagreed with the State's claim that exigent circumstances justified an entry into defendant's home when the police were investigating an armed robbery. The court found in part that it was unreasonable for the police to forcibly open an outer door to an apartment building at 2 a.m. *Wormack* can be distinguished because here the crime under investigation was much more serious and involved violence. Additionally, in the present case the police officers saw the suspect flee from them into the apartment building. We believe the testimony established the police entered the apartment as peacefully as was reasonably possible under the circumstances.

Although Henson did not dispute these points, the consideration of the remaining factors enumerated in *White* also leads to the conclusion that exigent circumstances were present. First, the crime was committed only 28 hours prior to Henson's arrest. Second, the crime was violent. Third, the police had probable cause to arrest Henson based on information that the gun found on the scene was connected to Martin and that Martin and Henson were together immediately prior to the incident. Henson returned to Hardiman's apartment approximately one-half hour after the intruders left the crime scene. At that time, Henson was looking for Martin and appeared to have blood on his pants. The police knew there were three offenders involved. The physical descriptions of two offenders obtained from the victims matched the descriptions of Henson and Martin that Mrs. Martin and Hardiman gave the detectives. Fourth, based on information from Hardiman, the police had a strong reason to believe that Henson was on the premises.

Accordingly, we believe a review of the testimony establishes that the trial court's finding that exigent circumstances existed was not manifest error.

MARTIN'S MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

On appeal, Martin argues the trial court wrongfully denied his motion to quash arrest and suppress statements; this issue was not raised by his public defender but rather by Martin in a *pro se* brief. The arguments raised in the brief, however, only relate to the motion to suppress statements and not to the motion to quash arrest. Martin argues his statement should be suppressed because he was beaten by police and denied the opportunity to speak with an attorney.

At the hearing on the motion, Martin testified he was arrested by at least 10 police officers in plain clothes who told him he was going to die. He was taken outside and beaten. He was beaten with a flashlight in the police car before being taken to the station. When he arrived at the station, he asked the police officers if he could make a telephone call but he was hit in the mouth. He was placed in a small room and handcuffed to the wall when several officers came in and beat him. Later, several officers returned, forced Martin to remove his clothes, and questioned him about "certain scratches" and "body marks." He was again beaten until he gave an oral statement concerning the incident. The officers returned his clothes, and an assistant State's Attorney interviewed him. He gave an oral statement but when he refused to sign a written statement, the police officers beat him again. Martin testified that during this time, he was not allowed to telephone an attorney.

On cross-examination, Martin testified he was beaten over a period of hours and was struck in the head and other parts of his body but never in the face. At some points in his testimony, Martin claimed there were marks on his body as a result of the beatings and at other points he stated the officers did not leave marks. The following morning after he was arrested, Martin requested medical attention. He told a paramedic that the police beat him and the paramedic gave him Tylenol. Martin claims the paramedic did not examine him prior to giving him medication. Martin also admitted that prior to being taken into police custody he gave substantially the same statement to his mother and to his friend Larry Larue.

The State presented witnesses who denied Martin's allegations. Martin was arrested on December 19, 1984, at approximately 2:30 a.m. Detective Fred Stone, one of the arresting officers, testified Martin was read his *Miranda* rights at the scene and when he was interviewed at the station. Detectives Carl Schmitt and Dennis Gray drove Martin to the police station in an unmarked police car. At the police station, Detectives Schmitt and Stone informed Martin of his *Miranda* rights and Martin indicated he wanted to talk. He gave the detectives an oral statement concerning the incident.

Detectives Stone, Schmitt, and Gray testified that they did not beat Martin or coerce him with psychological pressure. None of the three detectives slapped defendant with their fists, beat him with a flashlight, or threatened him. Neither the detectives nor anyone in their presence forced Martin to strip naked or slapped his genitals. There was no written statement prepared and Martin was not beaten for refusing to sign one. Stone, Schmitt, and Gray testified Martin

never asked to consult with an attorney. Schmitt testified that Martin's shirt and blue jeans were removed for evidence, they were inventoried and then returned to him. Stone testified the police required Martin to open his pants because they had information that one of the men was scratched in the attack.

Richard Schwind, an assistant State's Attorney, testified he interviewed Martin at approximately 4 a.m. with a detective present. He informed Martin of his *Miranda* rights, which Martin said he understood, and Martin gave him an oral statement. Martin, however, did not want to sign a written statement. Schwind asked Martin whether he was mistreated and he answered he was not. Schwind also testified that Martin stated he was "feeling fine." Schwind denied that anyone beat Martin or used psychological pressure on him and denied that Martin requested an attorney.

The trial court, in denying the motion, focused on several factors: each police officer and the assistant State's Attorney denied any coercion, there was no physical evidence to substantiate Martin's claim he was beaten, and Martin previously. gave his mother and Larry Larue substantially the same statement he gave to police.

■■ ■ For a confession to be admissible as evidence, the trial court must determine that it was made voluntarily without compulsion or inducement. (*People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179.) The State must prove by a preponderance of the evidence that a defendant's confession was voluntary. (*People v. Clark* (1986), 114 Ill. 2d 450, 501 N.E.2d 123.) On a motion to suppress, it is the trial court's duty to resolve conflicts in evidence and determine the credibility of the witnesses. (*People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675.) The trial court's finding that defendant's confession was voluntary will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949.

■■ From our review of the testimony, the trial court was presented with conflicting evidence as to whether Martin's statement was voluntary and whether Martin requested the opportunity to consult with an attorney. The only evidence of physical coercion was Martin's testimony. There was no medical corroboration presented that Martin incurred any injury although he requested medical attention. Each of the State's witnesses denied Martin's claim of coercion. When defendant's testimony is the only evidence of coercion and the State's witnesses deny coercion, the trial court is in the best position to evaluate the credibility of the witnesses. (*People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, quoting *People v. La Frana* (1954), 4 Ill. 2d

261, 122 N.E.2d 583.) Each of the State's witnesses also denied that Martin requested an attorney. It was the trial court's determination that the State's witnesses were credible. We will not disturb that finding as it was not against the manifest weight of the evidence. Martin's motion to suppress statements was properly denied.

#### JONES' MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

Jones argues the trial court improperly denied his motion to quash arrest. The motion was based on Jones' contention that the police deceived his mother into believing they had an arrest warrant for Jones, thereby gaining entry into their home to arrest Jones. Jones argues that based on the misrepresentation, the consent to enter was invalid.

Jones presented two witnesses at the hearing on the motion, himself and Detective Thomas Johnson. Jones testified that on December 19, 1984, he was at home, where he lived with his mother and two sisters. At approximately 5 a.m., Jones heard someone "beating" on the door to the apartment. He was sleeping on the couch, which was 25 feet from the door. Jones' mother went to the door and asked who was there. Police officers identified themselves and she opened the door. Jones testified an officer told his mother they had a warrant for his arrest and he saw the officer reach in his coat, pull out some papers, and put them back in his coat. The officers then "rushed" to the couch where Jones was, put pistols to his head, and handcuffed him.

Detective Johnson testified that he was with an unspecified number of other detectives when Jones was arrested. They knocked on the door to Jones' apartment and identified themselves as police officers. When Jones' mother opened the door, they told her they were looking for Charles Jones. She told them to come in and motioned to the couch where Jones was sleeping. The officers placed Jones under arrest. Johnson admitted they did not have an arrest warrant; however, the State did not question Johnson as to whether he or any of the other officers told Jones' mother they had an arrest warrant. After the arrest, Jones' mother signed a consent-to-search form and certain evidence was recovered from the apartment.

After the defense presented its witnesses, the State moved for a directed finding, arguing that defendant did not meet his burden on the motion. The trial court granted a directed finding and therefore, it did not require the State to present evidence on the motion to quash.

On appeal, Jones argues that his unrebutted testimony established the police deceived his mother into believing they had an arrest war-

rant. He contends his testimony was unrebutted because Detective Johnson was never asked whether the officers told Jones' mother they had an arrest warrant. Jones argues that because the prosecution failed to rebut his testimony, the trial court should not have disregarded his testimony. As a result, Jones argues his arrest should be quashed and his statements and the property recovered from his apartment should be suppressed in a new trial. In response, the State argues that the evidence established Jones' mother voluntarily consented to the entry and that the trial court could properly disregard defendant's testimony because it was not credible.

■■ ■ A warrantless entry into a person's home to effectuate an arrest is presumptively unreasonable (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371); however, it can be justified by voluntary consent to enter given by a person who has control over the premises (*People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608). Whether consent is voluntary is determined by the totality of the circumstances. (*People v. Turner* (1986), 143 Ill. App. 3d 417, 493 N.E.2d 38.) The State has the burden of proof when it relies on voluntary consent to justify a warrantless entry and it must establish "more than acquiescence to a claim of lawful authority." (*Bumper v. North Carolina* (1968), 391 U.S. 543, 549, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792.) "[I]t is the trial court's function to determine the credibility of the witnesses and to resolve conflicts in the evidence." (*People v. Turner* (1986), 143 Ill. App. 3d 417, 424, 493 N.E.2d 38, 42.) The trial court's finding with regard to a motion to quash arrest will not be disturbed on appeal absent manifest error. *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.

In *Bumper*, which Jones relies on, the defendant was arrested in his home, where he lived with his grandmother. Defendant moved to suppress evidence, and at the hearing, defendant's grandmother testified that four police officers came to their house and one of them said they had a search warrant. She told them, "Go ahead." Defendant's motion to suppress was denied. On appeal, the United States Supreme Court held that a search cannot be lawful on the basis of consent when the consent was obtained only after police officers asserted they had a search warrant.

In *People v. Peck* (1974), 18 Ill. App. 3d 112, 309 N.E.2d 346, which Jones also relies on, defendant was the only witness to testify at the hearing on his motion to suppress statements. He testified he gave his statement to police after they threatened him and promised him leniency. His testimony was unrebutted. Without presenting evidence, the State requested the trial court to deny the motion. The

trial court found defendant's testimony was not credible and denied his motion to suppress without requiring the State to present evidence. On review, the appellate court reversed, finding it was improper for the trial court to disregard defendant's uncontroverted testimony.

■ In the present case, Jones testified he heard the police tell his mother they had a warrant for his arrest and he saw an officer pull out papers from his coat. Detective Johnson testified the police did not have an arrest warrant. The State, however, did not ask Johnson whether he or any other officer falsely represented to Jones' mother that they had an arrest warrant. The State argues that Jones' testimony was not credible, and therefore, it could properly be disregarded. However, Jones presented sufficient evidence to overcome a motion for a directed finding. His unrebutted testimony would justify quashing his arrest, and therefore, it was improper for the trial court to grant the State a directed finding on the motion. (See *People v. Peck* (1974), 18 Ill. App. 3d 112, 309 N.E.2d 346.) The State should have been required to present evidence in support of its claim that the consent to enter was given voluntarily. Accordingly, Jones' convictions must be reversed and remanded for new trial, at which time defendant's motion to quash his arrest may be renewed. Should defendant Jones' motion to quash be denied on remand, new judgments of convictions are to be entered on all counts except for one count of attempted murder. Despite defendant's argument that this court quash his arrest, the record before us presents insufficient evidence to support such a finding.

Except for one count of attempted murder discussed later in this opinion, we note that the evidence presented at trial was sufficient for the trier of fact to find Jones guilty beyond a reasonable doubt. Our determination that the evidence was sufficient removes the risk of subjecting Jones to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

## II

Henson contends the admission of bloodstain identification testimony based on the process of electrophoresis denied him a fair trial. At trial, the State presented a microanalyst who testified as to tests she performed on the victims' and defendants' blood samples. On behalf of each defendant, Jones objected to the admission of electrophoresis test results arguing the process was unreliable. The court overruled the objection. The microanalyst then testified, in part, that based on electrophoretic tests, blood found on Henson's shoes was consistent with Mrs. L.'s blood and that a vaginal swab taken from Mrs. L. was consistent with Hen-

son's blood.

██ Henson contends the electrophoresis test is unreliable and should not have been admitted at trial, relying on this court's opinion in *People v. Harbold* (1984), 124 Ill. App. 3d 363, 381, 464 N.E.2d 734, 748, where this court stated:

> "We cannot hold that electrophoretic detection of genetic markers in field conditions is unreliable as a matter of law, but we believe that some questions as to scientific acceptance of the technique remain unanswered in this record and in the case law."

We do not believe our holding in *Harbold* supports Henson's contention that the evidence of bloodstain analysis based on the process of electrophoresis was inadmissible. *Harbold* clearly states that this court was not prepared to find electrophoresis unreliable as a matter of law. We note that in *People v. Partee* (1987), 157 Ill. App. 3d 231, 261, 511 N.E.2d 1165, 1185, which was written three years after *Harbold*, the court analyzed the concerns announced in *Harbold* and held, "electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible in a court of law." (See also *People v. Bradney* (1988), 170 Ill. App. 3d 839, 525 N.E.2d 112.) Accordingly, there is no support for finding that evidence of electrophoretic tests results is inadmissible as a matter of law and Henson's argument is without merit.

### III

Each defendant was convicted of the attempted murders of Mr. L. and Mrs. L. Each defendant argues he was not proven guilty beyond a reasonable doubt of the attempted murder of Mr. L. The State responds that the intent to kill was established verbally by defendants' threats and by the brutal character of the assault on Mr. L. Neither Henson nor Jones raised this issue in his motions for new trial; however, the issue was raised in Martin's motion for new trial, and therefore, the issue was considered by the trial court. We agree with defendants and reverse one count of attempted murder against each defendant.

██ To establish attempted murder, the evidence must prove that, beyond a reasonable doubt, defendants intended to kill Mr. L. (See *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28.) The specific intent to kill may be inferred from the circumstances, such as the character of the assault on the victim and the use of a deadly weapon. (*People v. Treadway* (1985), 138 Ill. App. 3d 899, 486 N.E.2d 929.) Intent to commit great bodily harm is insufficient to support a conviction for attempted murder (*People v. Winters* (1986), 151 Ill. App. 3d 402, 502 N.E.2d 841), and every assault involving serious bodily in-

jury does not necessarily support a conviction for attempted murder (*People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270). When a defendant claims he was convicted on insufficient evidence, the evidence must be reviewed in a light most favorable to the prosecution and the court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1.) On review, a criminal conviction will not be reversed unless the evidence presented is so unsatisfactory or improbable as to raise a reasonable doubt of defendant's guilt. *People v. Helton* (1987), 153 Ill. App. 3d 726, 506 N.E.2d 307.

In *People v. Thomas* (1970), 127 Ill. App. 2d 444, 262 N.E.2d 495, on which defendants rely, a man holding a knife confronted a woman in her apartment. He banged her head against a chest of drawers, hit her in the head repeatedly, and picked at her face with a knife. He then forced her into the bedroom, stabbed her in the shoulder, and raped her. During the attack, the man threatened to kill the woman several times. The man was convicted of rape, attempted murder, robbery, and aggravated battery. On review of the conviction for attempted murder, the court found the evidence was insufficient to establish the mental state for attempted murder.

In the present case, the evidence viewed in a light most favorable to the prosecution established Mr. L. was hit several times in the head with a gun, kicked repeatedly, and one of the defendants stomped on the back of his head several times. Defendants threatened that he and his family would be killed. He also overheard two of the defendants arguing about whether they should kill the family. As a result of the attack, Mr. L. was treated as an outpatient at the hospital. He had several lacerations to the head and a broken nose and his injuries required 25 stitches.

Although Mr. L. suffered serious injuries and defendants threatened his life, we do not believe that any rational trier of fact could have found the evidence presented at trial established defendants intended to kill him. Defendants had a gun and knife in their possession but did not use the knife in their attack on Mr. L. Defendants did not fire the gun but used it to beat Mr. L. The character of the attack on Mr. L. was not of the type that justifies an inference of an intent to kill. Although his injuries were serious, there was no evidence presented that they were life-threatening.

We believe the evidence was insufficient to establish the intent to kill Mr. L. which was necessary to sustain an attempted murder conviction. We therefore reverse one count of the attempted mur-

der convictions against each defendant. The trial court sentenced defendants to a single sentence for their multiple convictions. We cannot speculate as to what weight the trial court gave the attempted murder convictions when sentencing defendants, and, therefore, we remand for resentencing as to Henson and Martin. See *People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261; *People v. Alejos* (1982), 104 Ill. App. 3d 414, 432 N.E.2d 1046, *aff'd* (1983), 97 Ill. 2d 502, 455 N.E.2d 48.

## IV

Next, Martin argues he was not proven guilty beyond a reasonable doubt of aggravated criminal sexual assault of Mrs. L. because there was no evidence that Martin committed the acts, there was no evidence that the defendants planned to commit any crime other than robbery, and he did not learn of the sexual assaults until after they were legally completed. We find this argument is without support in the record.

A defendant may be held accountable for a crime when either before or during the commission of an offense, with the intent to promote or facilitate the commission, defendant solicits, aids, abets, agrees, or attempts to aid another person in planning or committing the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) A defendant can be held accountable for rape (now aggravated criminal sexual assault) when he was aware that the commission of the offense was taking place even though there is no evidence he actually participated in the act. (*People v. Tyler* (1979), 78 Ill. 2d 193, 399 N.E.2d 975.) In *Tyler*, defendant was held accountable for rape when he and two others forcibly entered a house and one of the men raped the victim in the bedroom. Defendant was in the living room at the time, and in his statement to police, he stated that he thought the man was raping the victim. Defendant warned the others when a car approached the house. The supreme court found defendant was properly convicted of the rape because he knew the offense was being committed, did not disassociate himself from the crime, and warned the others when a car was approaching the house.

In Martin's statement, he admitted he left the apartment for a short time to watch out for police. When he reentered the apartment, he saw Henson in the act of raping Mrs. L. and he saw Jones sexually abuse R.L. Martin then proceeded to remove property from the apartment and into Mr. and Mrs. L.'s car. When Jones and Martin left the apartment, Jones told Martin that Henson was "still up messing with the woman."

The evidence conclusively established that Martin saw the crime being committed, did nothing to disassociate himself, and continued to assist Henson and Jones. Martin's argument that he could not be held accountable is without support in the record, and, accordingly, he was properly convicted of aggravated criminal sexual assault.

Affirmed in part; reversed in part and remanded for resentencing; and reversed in part and remanded for new trial.

MURRAY, P.J., and PINCHAM, J., concur.