2022 IL App (1st) 190275-U

No. 1-19-0275

Filed March 17, 2022

Fourth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 1258 |
| | ) | |
| GEMAYEL PEACOCK, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge, presiding |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*: Evidence was sufficient to prove beyond a reasonable doubt that defendant had a specific intent to kill when he fired a handgun through the front door of an apartment striking three people; defendant was not entitled to an instruction on child endangerment; defendant's constitutional right to a speedy trial was not violated; and defendant failed to present evidence to show that his aggregate 93-year sentence is unconstitutionally disproportionate when he committed the offense at age 23.

¶ 2     Following a jury trial, Gemayel Peacock was convicted of the attempted first degree murders of Sade Briscoe and her two children, Deniah Smith and Devon Vance, and sentenced to an aggregate term of 93 years in prison. He appeals, arguing that the State failed to prove he had a

specific intent to kill when he fired a handgun through the closed door of Briscoe's apartment striking her and both of her children. He also argues that the circuit court erred by refusing to instruct the jury on child endangerment, with respect to the child victims, as a lesser-included offense. He further contends that his right to a speedy trial was violated since the trial did not commence until nearly ten years after his arrest. Finally, he argues his 93-year sentence is an unconstitutional *de facto* life sentence that failed to account for his youth as an "emerging adult" of 23 at the time of the offense. We affirm.[1]

¶ 3                                                    I. BACKGROUND

¶ 4        In 2008, Sade Briscoe lived in an apartment located in Riverdale, Illinois, with her two children, Deniah Smith, then age four, and Devon Vance, then age one.[2] That year, she began dating Peacock, then age 23. In December 2008, Briscoe broke up with Peacock on amicable terms and the two stayed in contact. As Briscoe was driving home from work on December 15, 2008, she spoke with Peacock over the phone. She described their conversation as friendly. Upon arriving at her apartment building, Briscoe noticed Peacock's vehicle parked nearby. Still connected by phone, she asked him if he was there. Peacock confirmed he was and told Briscoe that he missed her and wanted to see her.

¶ 5        Briscoe thought it was strange that Peacock was at her building since he had not mentioned his intent to visit during their 45-minute phone conversation. As Peacock, and two other men, Keith Anderson and Maurice Brown, exited Peacock's vehicle and walked toward Briscoe's vehicle, she "felt weird" and locked her doors. Standing outside her door, Peacock demanded she open it and asked why she would not.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.
[2]Hereafter, we refer to the children by their first names.

¶ 6        Lonnie Vance, Devon's father, was caring for Devon and Deniah at Briscoe's apartment. Noticing the situation, he went outside and approached Briscoe's vehicle. Vance and Peacock's party began shouting at each other. Briscoe asked Vance to return to the apartment, and he complied. Peacock and his friends returned to his vehicle and drove away. After he left, Briscoe exited her vehicle and went inside to her apartment.

¶ 7        Later, Briscoe began receiving phone calls from Peacock. He was angry and screamed at her. Peacock accused Briscoe of ending her relationship with him to resume one with Vance. Briscoe also received a call from Peacock's friend, Stinson Caldwell. Caldwell told Briscoe that Vance had threatened Peacock. Caldwell wanted to speak to Vance. Vance, who did not know Caldwell, refused to speak to him.

¶ 8        Around 9 p.m., as Briscoe was getting her children ready for bed, she heard a soft knock on the door. She asked, "who is it?" There was no response. Briscoe looked through the peephole but saw no one outside the door. To enter the apartment building, a visitor must be "buzzed in" at the front gate. That is, a system enables each apartment to communicate with someone at the front gate by intercom and residents can unlock the gate by depressing a button. Briscoe had not buzzed anyone in. Moments later, there was a second knock. Like the first, there was no response to Briscoe's inquiry, nor did she see anyone through the peephole. Moments later, there was a louder knock, followed by someone kicking the door. Briscoe recognized Peacock's voice angrily shouting, "open the f***ing door" and other obscenities. Through the peephole, she saw Peacock and Caldwell outside the door. Briscoe told them, "I can't believe you came over here to jump on Lonnie, and you know our kids are here." As the kicking and shouting continued, Vance placed his body against the wooden door to prevent it from opening. In an effort to prevent entry, Briscoe

and Vance then moved a sofa against the door. Peacock shouted, "bust through that mother f***er!" Then, three gunshots rang out in rapid succession.

¶ 9        After hearing shots, Briscoe observed that Deniah appeared to be bleeding from her neck. Briscoe called 911 as Deniah was turning blue. Following the 911 operator's direction, Briscoe applied pressure to Deniah's neck as they waited for help. Police officers and paramedics arrived and began rendering aid to Deniah. Briscoe then felt a tug on her pant leg. Her son, Devon, showed her a hole in his pants and a wound to his leg. The emergency personnel then called for another ambulance. Briscoe then felt a burning sensation on her leg. She looked down and observed that she, too, was bleeding.

¶ 10       Deniah, Devon, and Briscoe were all treated for single gunshot wounds. Briscoe had been struck in the lower leg and, against medical advice, left the hospital the following morning to be with her children, who were being treated in a different hospital. Devon, who turned two years old the day of the shooting, sustained a "through-and-through" gunshot wound to the inner part of his upper leg. Devon's treating physician placed him in intensive care (ICU) since the force of the bullet could have damaged an artery, vein, or nerve in the upper leg. Devon was discharged from the hospital 48 hours after he was admitted.

¶ 11       Deniah's injury was far more serious. The bullet struck near her clavicle, damaging certain arteries and veins. Deniah was bleeding heavily and required surgery and transfusions to save her life. She lost 70 to 80% of her circulating blood. A two-hour operation succeeded in stopping the bleeding. Deniah spent the next four days in the ICU and was discharged on December 22, 2008, after spending a week in the hospital.

¶ 12       During their investigation, police found three holes through the center of Briscoe's door, three discharged cartridge casings, and two fired bullets inside the apartment. Briscoe also related

to police that Peacock had fired the shots through her door. With that information, the Riverdale Police Department issued a bulletin naming Peacock as a suspect in the shooting. Based on the Riverdale bulletin, a Sauk Village Police Department officer stopped a vehicle being driven by Peacock later that night. Peacock was arrested and transported to a Riverdale police station. While there, he agreed to speak with an Assistant State's Attorney (ASA) and signed a statement providing his account of events.

¶ 13 According to Peacock's statement, he started dating Briscoe in the summer of 2008. He "had problems" with Vance, whom Peacock knew to be Devon's father. Briscoe broke up with Peacock on good terms, but they continued to have contact. On December 15, 2008, he and Briscoe spoke on the phone and discussed resuming their relationship. Peacock, along with Anderson and Brown, drove to Briscoe's apartment to "surprise her." Peacock arrived at Briscoe's building before her. He stated that, upon her arrival, she was "acting funny" and locked her car door while refusing to get out of the vehicle. Vance approached and "had words" with Anderson.

¶ 14 Peacock left and started exchanging text messages with Briscoe. She insulted him and he "felt she had made a fool out of [him]." Peacock then called Caldwell for "backup" because Peacock planned to return and fight Vance. Peacock met Caldwell at one location, then drove to Caldwell's home to retrieve a firearm. Afterward, they drove back to Briscoe's apartment to fight Vance.

¶ 15 Peacock, Caldwell, and Anderson entered the apartment building by pressing all the individual apartment intercom buttons until someone "buzzed" them in. After entering the building and going to Briscoe's apartment, Caldwell knocked on the door and Peacock heard Briscoe ask, "who is it?" They did not respond. Anderson and Peacock kicked the door. Peacock heard Vance

say, "that's Jay"—a reference to Peacock. Peacock then heard Vance say, "f*** that, go get my gun."[3] Peacock's statement continues as follows:

"I knew [Briscoe], [Vance], and both kids were in the apartment. I could hear the kids talking loud and making noise inside. I knew [Vance] was on the other side of the door when he told [Briscoe] to get his gun.

I told [Caldwell] to give me the gun and he handed me his gun. I then fired three rounds into the door."

Peacock and the others returned to his vehicle, where he handed the gun back to Caldwell. He then drove to Caldwell's residence. Peacock further explained:

"[t]his whole thing is about my problems with [Vance], not with [Briscoe]. I went to confront [Vance]. I did not see [Vance] when we went back to the apartment. He did not open the door and I did not see him with a gun."

¶ 16    Police went to Caldwell's residence on the night of the shooting. There, they recovered two firearms: a 9-millimeter Kel-Tec semiautomatic pistol with four live rounds in the magazine and a Skyy Arms 9-millimeter semiautomatic pistol containing ten live rounds. The Kel-Tec pistol was found in a cellular telephone box and twelve 9-millimeter rounds were found in a white sock. An investigator from the Illinois State Police testified that the three discharged cartridge casings and two fired bullets recovered from Briscoe's apartment were fired from the Kel-Tec pistol found at Caldwell's residence.

¶ 17    Police also observed visible footwear impressions on the front door to Briscoe's apartment. Portions of the door were cut and sent to the Illinois State Police. An investigator compared the impressions to the Nike shoes Peacock was wearing at the time of his arrest. She testified that the

_____

[3]Vance and Briscoe both testified that Vance did not say "go get my gun." Both also testified that Vance did not possess a firearm at that time and police did not recover a firearm in Briscoe's apartment.

impressions were consistent with Peacock's right shoe, but she could not render an opinion on whether his shoe made the impressions.

¶ 18    The jury found Peacock guilty of three counts of attempted first degree murder. The jury also found that in committing the offense against Deniah, Peacock personally discharged a firearm causing her great bodily harm. As to the offenses against Briscoe and Devon, the jury found that Peacock personally discharged a firearm. Additionally, the jury found Peacock guilty of three counts of aggravated battery with a firearm.

¶ 19    At sentencing, the trial court merged the three lesser-included aggravated battery with a firearm counts into the three attempted first degree murder counts. The court then noted that the jury's findings on personal discharge of a firearm enhanced the minimum sentence by 20 years for the attempted murder counts related to Briscoe and Devon. Likewise, the court noted that a mandatory enhancement of 25 years applied upon the jury's finding that Peacock personally discharged a firearm causing great bodily harm to Deniah.

¶ 20    The court further noted that consecutive sentencing would apply if the court found that the separate offenses each resulted in severe bodily injury. While recognizing that a gunshot wound does not necessarily constitute severe bodily injury, the court discussed several appellate cases that examined whether an injury inflicted by a gunshot was found to be severe bodily injury. A graze wound, a minor cut, and a wound requiring no more than a few hours in the hospital were examples of injuries found not to be severe. In contrast, the court reasoned that the injuries to the victims in this case were far more serious and resembled the injuries in cases where courts found the injury was severe. Specifically, the court observed that Deniah, shot in the upper chest, lost a large amount of blood, required surgery to save her life, and spent several days in the ICU; Devon was admitted to the ICU due to concern about vital arteries and veins in the inner leg where he was

shot; and Briscoe, who spent a shorter time in the hospital, checked herself out of the hospital against medical advice to be with her children. Thus, the court found that all three attempted murders resulted in severe bodily injury.

¶ 21        Next, the court found that the trial evidence and other information provided for sentencing made several statutory mitigation factors inapplicable. Specifically, the court found: (1) Peacock caused bodily harm, (2) he contemplated his conduct could cause bodily harm, (3) he did not act under strong provocation, (4) nothing tended to excuse or justify his conduct, (5) no one induced or facilitated his conduct, (6) he was not paid to do this, (7) he was on bond at the time of the offense having been previously charged with aggravated kidnapping with a firearm and unlawful restraint, (8) the conduct could recur as Peacock has anger issues and committed more than one armed offense involving a former girlfriend, (9) he was not eligible for probation, (10) he does not support his three children, and (11) imprisonment would not endanger a medical condition. At the same time, the court found some statutory aggravating factors applied: Peacock caused serious harm; he had a history of prior criminal activity; and he committed the offense while released on bail for another offense.

¶ 22        Reviewing the presentence investigation report (PSI), the court stated that Peacock's background did not show a predisposition to commit crime. To the contrary, the court noted Peacock had a stable and supportive family, he was not abused in any manner, he completed the eleventh grade and then a GED, and he played sports. In addition, there was no indication of substance abuse or mental health issues. The court commented, "[t]he PSI would seem to indicate that [Peacock] finds himself in this situation not due to some troubled upbringing or gangs or drugs or an abusive home life, rather it's because of the choices he made."

¶ 23        Before announcing sentence, the court remarked as follows:

"The defendant planned this act. He went to go get [Caldwell] and [Anderson]. He made the threatening phone calls. He got a gun. And he got a gun while he currently ha[d] a pending case involving an aggravated kidnapping with a firearm where the victim [was] alleged to be his ex-girlfriend.

He returned and he managed to get in without being buzzed into the apartment building by Briscoe. This would seem to indicate that he wasn't there to just have a conversation.

Particularly troubling is the testimony that happened before the kicking. It was described as a quiet 'knock, knock, knock' on the outside with no one at the peephole. The Court considers this as an attempt to lure the victims to open the door, to get them to open the door as multiple co-defendants waited outside.

The defendant then kicked the door after he was unable to lure the victims to open the door. Briscoe told the defendant that there w[ere] children inside. And when he was unable to get inside, he fired multiple times.

It's only because of life-saving actions of the pediatric surgeon that Deniah survived[,] in the Court's opinion. Devon is going to have to live with the fact that his birthday is now the anniversary of the day he was shot."

¶ 24    The court then sentenced Peacock to consecutive prison terms of 41 years for the attempted first degree murder of Deniah; 26 years for the attempted first degree murder of Devon; and 26 years for the attempted first degree murder of Briscoe—an aggregate term of 93 years. The terms were also consecutive to Peacock's prison term for his separate aggravated kidnapping with a firearm conviction.

¶ 25    Peacock later filed a motion requesting the court vacate his sentence and impose a new, lower sentence. The motion argued that the aggregate sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) as the sentence was disproportionate and, since unsurvivable, did not fulfill the objective of restoring Peacock to useful citizenship. The motion further contended that the sentence amounted to an unconstitutional, *de facto* life term that failed to account for Peacock's age and rehabilitative potential. Noting that Peacock relied on authority applicable to juveniles and he was 23 at the time of the offense, the court denied the motion. Peacock filed a timely notice of appeal.

¶ 26    Peacock's trial took place in November 2018, nearly 10 years after the crime and his arrest. The State elected to proceed with Peacock's aggravated kidnapping case first. That case went to trial in 2010 and Peacock was sentenced in 2011. During the litigation of that case, Peacock's counsel indicated, on the record in this case, that he wished to wait until the aggravated kidnapping case concluded as the resolution of that case could affect how he wished to proceed here. In October 2011, Peacock filed a motion to suppress his statement and physical evidence obtained following his arrest, which he claimed was unconstitutional. The circuit court granted his motion after a hearing in July 2012. The State indicated it would file a motion requesting the court to strike its suppression of evidence on the basis that the discovery of such evidence was attenuated from the unconstitutional arrest. However, the State obtained three continuances and took six months to file that motion. After a hearing in March 2013, the court granted the State's attenuation motion. Peacock then filed a second motion to suppress his statement on grounds that he was not informed of his *Miranda* rights and that he was subjected to coercion. The matter was continued by agreement numerous times. A private attorney filed an appearance and the Public Defender, who had represented Peacock up to August 2016, withdrew. Peacock amended his motion to suppress

his statement, asserting that his statement was coerced since he was not provided his requested antiseizure medication before he gave his statement. The motion was denied following a hearing in December 2017.

¶ 27     Trial was set to begin in April 2018. A month before, the State informed the court of a plea offer and the defense requested a continuance to consider it. Two weeks later, a new private attorney appeared, and Peacock's prior counsel withdrew. Peacock then filed a motion to dismiss asserting that his constitutional right to a speedy trial had been violated. After reviewing briefs and hearing oral argument from both Peacock and the State, the trial court denied the motion to dismiss. The court analyzed the issue under the factors established by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). While noting that the delay was lengthy, the court found much of it was attributable to Peacock as he decided to change counsel more than once. By contrast, the court did not believe the State's assignment of different ASAs to the case from time to time had prejudiced Peacock. The court found most significant that Peacock failed to assert his speedy trial right until filing the motion to dismiss in 2018.

¶ 28                                   II. ANALYSIS

¶ 29     On appeal, Peacock claims that (1) the State failed to prove he had the specific intent to kill when he fired a handgun through the closed door of Briscoe's apartment, (2) the circuit court erred by refusing to instruct the jury on child endangerment, with respect to the child victims, as a lesser-included offense, (3) his right to a speedy trial was violated since the trial did not commence until nearly ten years after his arrest, and (4) his 93-year sentence is an unconstitutional *de facto* life sentence that failed to account for his youth as an "emerging adult" of 23 at the time of the offense.

¶ 30                             A. Specific Intent to Kill

¶ 31     Peacock first argues that the evidence was insufficient to prove that he had a specific intent to kill. He requests that we vacate his three attempted first degree murder convictions and remand for sentencing on the lesser, merged counts of aggravated battery with a firearm. When a defendant challenges the sufficiency of the evidence, we do not retry the defendant or substitute our judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. "It is the responsibility of the fact finder, not the reviewing court, to determine the credibility of witnesses, to resolve any conflicts in the evidence and to draw reasonable inferences from the evidence." *Id*. Our standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. ¶ 23. We will reverse a conviction for attempted murder only where the evidence presented is so unsatisfactory or improbable as to raise a reasonable doubt of the defendant's guilt. *People v. Hill*, 276 Ill. App. 3d 683, 690 (1995).

¶ 32     To convict a defendant of attempted murder, the State must prove beyond a reasonable doubt that (1) the defendant performed an act constituting a substantial step toward the commission of first degree murder, and (2) the defendant possessed the specific intent to kill. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39.

> "Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life." [Internal quotation marks omitted.] *Id*.

"The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." [Internal quotation marks omitted.] *Teague*, 2013 IL App (1st) 110349, ¶ 26.

¶ 33   Viewing the evidence in the light most favorable to the State, a rational jury could find the essential elements to convict Peacock of attempted murder. Trial evidence demonstrated that (1) Peacock had a verbal confrontation with Vance outside of Briscoe's apartment, (2) Peacock was angry about Briscoe's contact with Vance following her breakup with Peacock, (3) Peacock returned to Briscoe's apartment with Caldwell and a handgun, (4) Briscoe made statements indicating that she, Vance, and the two small children were inside, (5) Peacock admitted he knew they were on the other side of the door, (6) Peacock and Caldwell repeatedly kicked the door and demanded that it be opened, (7) Vance was against the door and later moved furniture to prevent the door from opening, and (8) shots were fired through the door, striking three people on the other side. From that evidence, a rational jury could infer that (1) Peacock believed Vance was on the other side of the door, (2) he knew Vance, Briscoe, and her two children were inside the apartment, (3) Peacock deliberately obtained a firearm while planning to violently confront Vance, (4) Peacock personally fired the handgun through the door, and, ultimately, (5) in voluntarily and willfully doing so, he intended to kill whoever was on the other side. Under the doctrine of transferred intent, specific intent to kill is proven when, for example, a defendant shoots a person other than their intended victim so long as they had the specific intent to kill "*someone*." (Emphasis in original.) *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 65.

¶ 34   In arguing for reversal, Peacock asserts that firing a gun at another person is generally only one of several surrounding circumstances supporting an inference of intent to kill. See *People v. Homes*, 274 Ill. App. 3d 612, 622 (1995) (noting that several cases "considered firing a gun at another person as one of several surrounding circumstances."). He contends that the surrounding

circumstances, apart from his firing through the door, do not support such an inference. We disagree. The surrounding circumstances shown in this case were sufficient for the jury to infer Peacock fired the gun with intent to kill. Intent to kill can be proven by evidence of "the firing of a gun at or towards another person with either malice or a total disregard for human life." *Id*. at 623. The evidence supported that when Peacock fired through the door to Briscoe's apartment, he did so with malice. The shooting was preceded by Briscoe's breakup with Peacock and his unrequited request to rekindle their relationship. Then, Peacock had a verbal altercation with Vance outside of Briscoe's apartment while Briscoe refused to unlock her vehicle doors or further engage with Peacock. Peacock reacted angrily, later calling Briscoe to accost her for rejecting him for Vance. Instead of cooling off, Peacock decided that being "made a fool of" could not stand and escalated matters by returning with his "backup"—Caldwell and a handgun. As he admitted in his statement, he arrived wanting a fight. Peacock's deliberate efforts to retrieve a firearm demonstrated that he was also prepared to use deadly force. After arriving, Peacock repeatedly kicked the door and yelled for Briscoe or Vance to open it. With his demand unmet and his effort to enter unsuccessful, Peacock fired multiple rounds through the door. These circumstances indicate intense anger, jealousy, wounded pride, and desire for revenge—all supporting an inference that Peacock fired the gun maliciously. Further, from his knowledge of the apartment's size and configuration, and knowing that Briscoe, Vance, and the children were present, the circumstances evince Peacock fired the gun with total disregard for their lives. Accordingly, the surrounding circumstances provided ample evidence to support the jury's determination that Peacock had a specific intent to kill.

¶ 35     We are unpersuaded by Peacock's arguments to the contrary. First, his reliance on *People v. Upton*, 230 Ill. App. 3d 365, 372 (1992) is unavailing. In *Upton*, this court reversed a conviction

for attempted murder when a defendant fired two shots at a truck with two occupants who were repossessing the defendant's vehicle. One of the occupants was struck by a bullet in the back. *Id*. at 366-67. The conviction, however, was not reversed based on the sufficiency of the evidence. Rather, the appellate court found that the trial court erred by not allowing the defendant to testify regarding his intent when he fired the gun. *Id*. at 374. The court also found that the jury should have received the defendant's requested instruction on the lesser offense of reckless conduct. *Id*. at 377. As a remedy, it remanded for a new trial in which the defendant would be allowed to testify to his state of mind and the jury instructed on reckless conduct. *Id*. On retrial, the defendant in *Upton* could still be convicted of attempted murder, meaning a trier of fact could conclude he intended to kill when he fired at the truck. The mere fact that the trier of fact could reach the opposite conclusion when additional testimony is given, and it has the option to consider a lesser-included offense, does not mean the evidence was insufficient. Thus, *Upton* does not support Peacock's sufficiency of the evidence argument.

¶ 36    We are likewise unpersuaded by Peacock's argument that an intent to kill was not proven since he was not specifically aiming at anyone when he shot through the door. Peacock does not cite, nor are we aware of, any authority supporting his proposition that attempted murder requires proof of a "specific target." Rather, this court has found evidence of a specific intent to kill "someone" sufficient. *Edmondson*, 2018 IL App (1st) 151381, ¶ 65. An intent to kill someone is shown "where the defendant uses a deadly weapon 'indiscriminately' against a group of people." *People v. Harris*, 2016 IL App (1st) 141744, ¶ 29, *rev'd in part on other grounds*, 2018 IL 121032 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1108-09 (2001)). That is what occurred here. Peacock knew Briscoe, Vance, and the children were inside the apartment. Vance was against the door as it was being kicked, he moved furniture against it, and Briscoe spoke to Peacock. In his

statement, Peacock indicated he heard the children inside the apartment. He further stated that he heard Vance say, "go get my gun" and believed him to be on the other side of the door. Thus, the evidence supports that Peacock expected someone to be on the other side of the door when he fired. It is of no moment that he could not definitively see which specific person was on the other side of the door. Even crediting his statement's explanation that he fired in response to hearing Vance say something about a gun, his stated reason supports that he intended to kill. Though Peacock did not assert self-defense at trial, a person who uses deadly force under a subjective belief in self-defense, as Peacock's statement suggested, acts intentionally. See *People v. Getter*, 2015 IL App (1st) 121307, ¶ 36 ("the specific intent to kill one person in self-defense may be transferred to third parties ultimately affected by the acts of self-defense.").

¶ 37    Apart from that, the evidence also supported that Peacock specifically intended to kill Vance. As we noted, a verbal altercation with Vance preceded the incident and Peacock and Caldwell referred to Vance in their phone calls with Briscoe. In his statement, Peacock admitted that he returned to the apartment for the purpose of attacking Vance. Again, crediting Peacock's statement, he fired in response to Vance asking Briscoe to retrieve a firearm. Thus, the jury could reasonably conclude that Peacock intended to kill Vance.

¶ 38    We further reject Peacock's contention that specific intent to kill was not proven since the evidence did not show he made any threats to kill. While accompanying threats can support proof of the specific intent to kill, the absence of such threats does not disprove it. Nor does it negate otherwise sufficient evidence, as was proven here by the act of firing a handgun through the door at the apartment occupants and the surrounding circumstances.

¶ 39    Last, we are unpersuaded that Peacock's intent was not proven since he did not actually kill anyone yet "he had the opportunity to do so." Peacock likens his case to *People v. Thomas*,

127 Ill. App. 2d 444 (1970) and *People v. Jones*, 184 Ill. App. 3d 412 (1989). In those cases, this court reversed attempted murder convictions where "the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime." *Thomas*, 127 Ill. App. 2d at 456. In *Thomas*, the defendant entered the victim's apartment, beat her head against a chest of drawers, raped her, robbed her, picked at her face with a knife, cut her on the shoulder, and fled. *Id*. at 455. Similarly, in *Jones*, three defendants beat a victim during a home invasion and armed robbery. *Jones*, 184 Ill. App. 3d at 415-17. This court found it significant that, though armed with a handgun and a knife, the defendants never fired the gun (though they struck him in the head with it) nor stabbed the victim with the knife. *Id*. at 430. That is, they never used the deadly weapons in their possession in a deadly manner. The court observed "[a]lthough [the victim's] injuries were serious, there was no evidence presented that they were life-threatening" and concluded "[t]he character of the attack *** was not of the type that justifies an inference of an intent to kill." *Id.*

¶ 40    Peacock argues that if he had intended to kill Vance or anyone else in the apartment, he would have, as he had ample opportunity to do so. Specifically, he notes that instead of continuing to try to enter the apartment, he "left the premises on his own volition." Thus, like the defendants in *Thomas* and *Jones*, Peacock could have done more to try to kill someone inside the apartment, but, instead, he chose to leave.

¶ 41    We find this case distinguishable from *Thomas* and *Jones*. Unlike those cases, Peacock used a deadly weapon in a deadly manner by firing a handgun through the door with people on the other side. He did not merely use the handgun as a threat of force to facilitate a robbery or rape like the *Thomas* and *Jones* defendants. Further, he inflicted a life-threatening injury to Deniah,

who survived thanks to prompt and capable medical treatment. The shooting could have easily resulted in death.

¶ 42     In sum, when Peacock fired the handgun under the circumstances shown at trial, he took a substantial step toward the commission of first degree murder with the specific intent to kill. The crime of attempted murder was complete at that point. It is of no import that he did not make any additional effort to deliver a *coup de grâce*. We find that a rational fact finder could conclude that Peacock possessed a specific intent to kill, and we do not find the evidence so improbable or unsatisfactory to raise a reasonable doubt.

¶ 43                              B. Child Endangerment Instruction

¶ 44     Peacock next argues that the trial court erred by refusing his request to instruct the jury on child endangerment. He asserts that the lesser offense of child endangerment was included in the counts of attempted first degree murder and aggravated battery with a firearm, regarding Deniah and Devon. As such, he contends the jury could have found him guilty of child endangerment while acquitting him of the greater charges and, thus, he was entitled to a child endangerment instruction.

¶ 45     A defendant is entitled to have the jury instructed on a less serious offense than those charged if both (1) the less serious charge is included in the charged offense and (2) the evidence adduced at trial would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense. *People v. Hamilton*, 179 Ill. 2d 319, 323-24 (1997). Illinois courts use the charging instrument approach to determine whether an offense is lesser-included. *People v. Kennebrew*, 2013 IL 113998, ¶ 39. Under the charging instrument approach, courts examine whether the facts alleged in the charging instrument contain a broad foundation or main outline of the lesser offense. *Id.* ¶ 30. Whether an offense is lesser-included of

a charged offense is an issue of law reviewed *de novo*. *Id.* ¶ 18. However, we review a trial court's refusal to give a tendered instruction on a lesser-included offense for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

¶ 46        Holding aside the issue of whether the facts alleged in Peacock's indictment contain a broad foundation or main outline of child endangerment, we do not find that Peacock was entitled to a child endangerment instruction. The evidence did not permit the jury to rationally find him guilty of child endangerment yet acquit him of attempted first degree murder or aggravated battery with a firearm of Deniah and Devon. The child endangerment statute makes it unlawful to willfully cause or permit a child's life or health to be endangered or "placed in circumstances that endanger" the child's life or health. 720 ILCS 5/12-21.6(a) (West 2004). "[B]y its plain meaning, the term 'endanger' refers to a potential or possibility of injury. The term does not refer to conduct that will result or *actually* results in harm, but rather to conduct that could or might result in harm." (Emphasis added.) *People v. Jordan*, 218 Ill. 2d 255, 270 (2006); see also Black's Law Dictionary 547 (7th ed. 1999) (defining "endangerment" as "[t]he act or an instance of putting someone or something in danger; exposure to peril or harm."). In this case, the evidence adduced at trial showed that Peacock's conduct resulted in actual harm to Deniah and Devon. He did not merely expose them to potential harm.

¶ 47        A case Peacock cites for support illustrates this distinction. In *People v. Belknap*, 396 Ill. App. 3d 183 (2009), the defendant was convicted of first degree murder and endangering the life of a 6-year-old. Peacock offers *Belknap* to assert that "the same set of circumstances" support both charges. However, a closer reading of *Belknap* shows that the defendant's charges in that case

were not premised on identical conduct: he was charged and convicted of first degree murder for repeatedly striking the child who ultimately died from blunt force trauma to her brain, but he was charged and convicted of child endangerment for his conduct following the beating. Instead of seeking necessary medical attention for the child, the defendant left the injured child, who was in his care, unattended for hours while he used methamphetamine in the garage. *Id*. at 204. That conduct, by itself and apart from the beating, placed the child in circumstances that endangered her life. Thus, while the offenses in *Belknap* were related and shared some common facts, child endangerment was not included in first degree murder. They were charged separately, and different aspects of the defendant's conduct supported the distinct convictions. The same is not true in this case. Peacock's conduct of shooting through the door simultaneously endangered Deniah and Devon's lives and caused them actual bodily injury. So, even if guilty of child endangerment by that conduct, the jury could not also rationally acquit Peacock of the greater offense of aggravated battery with a firearm. The same conduct shows that he knowingly injured Deniah and Devon by means of discharging a firearm—the essential elements of aggravated battery with a firearm. See 720 ILCS 5/12-4.2(a) (West 2004). Accordingly, Peacock was not entitled to an instruction on child endangerment and the trial court did not err in refusing to give it.

¶ 48                                  C. Speedy Trial

¶ 49       The nature of the constitutional guarantee to a speedy trial is imprecise. *People v. Crane*, 195 Ill. 2d 42, 47 (2001) (citing *Barker*, 407 U.S. at 521). The statutory right, which proscribes a certain time to bring a defendant to trial, is not equivalent to the constitutional right. *Id*. at 48. Rather, the statute "operates to prevent the constitutional claim from arising except in cases involving prolonged delay or novel issues." [Internal quotation marks omitted.] *Id*. So, when a defendant asserts a violation of his constitutional right to a speedy trial, we assess the balance of

four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the prejudice, if any, to the defendant, and (4) the defendant's assertion of his right (the *Barker* factors). *Id.* (citing *Barker*, 407 U.S. at 530). We review whether a defendant's constitutional right to a speedy trial has been violated *de novo*. *Id*. at 52.

¶ 50 A delay of one year is "presumptively prejudicial." *Id*. at 52-53. The presumption does not imply actual prejudice to the defendant; rather, it triggers the court's duty to consider the remaining *Barker* factors. *People v. Echols*, 2018 IL App (1st) 153156, ¶ 21. Since Peacock was arrested in December 2008, indicted in January 2009, and not tried until November 2018, the delay in this case was clearly more than one year and presumptively prejudicial. Thus, we continue our inquiry.

¶ 51 The State bears the burden to justify the delay. *Crane*, 195 Ill. 2d at 53. We afford different weight to different reasons. *Id.* Reasons such as the unavailability or inability to locate a witness or a judge's illness are valid and justify reasonable delays. *Id.* at 53-54. But bad faith on the part of the State or intentional delay to gain a tactical advantage should be given great weight. *Echols*, 2018 IL App (1st) 153156, ¶ 25. More neutral reasons, such as a crowded court docket, faulty police procedure, negligence, or incompetence, still weigh against the State, but to a lesser degree. *Crane*, 195 Ill. 2d at 53. The defendant need only show that the delay was not attributable to his actions. *Echols*, 2018 IL App (1st) 153156, ¶ 25.

¶ 52 Different reasons account for different periods of delay in this case. The delay through mid-2011 is attributable to Peacock's separate aggravated kidnapping case. The State elected to proceed on that case first, which Illinois's speedy trial statute permits. See 725 ILCS 5/130-5(e) (West 2004). Likewise, Peacock's counsel expressed on the record that he wished to resolve that case before proceeding with this one. The delay from October 2011 through July 2012 was

occasioned by Peacock's motion to quash arrest and suppress evidence. The State was not prompt in filing its attenuation motion, but the record does not support any bad faith behind that delay.

¶ 53      After the attenuation motion was granted in March 2013, Peacock filed a new motion to suppress his statement, asserting different grounds from his first motion. Considerable delay ensued for various reasons, including defense requests for continuances, unavailable witnesses, missing reports, competing trial obligations of the judge and ASAs, and, on one occasion, Peacock's absence when Illinois Department of Corrections (IDOC) did not transport him when requested. In addition, Peacock obtained new counsel who requested time to review discovery and filed an amended motion to suppress. The suppression hearing finally took place in December 2017. Though lengthy, in our review of the record, the delays during this period do not weigh heavily against the State since such delays were either attributable to Peacock, excusable for valid reasons, or resulted from negligence or lack of diligence; not bad faith or intent to gain a tactical advantage.

¶ 54      Following the resolution of Peacock's motion to suppress, the case moved into a trial posture until Peacock, through new counsel, filed his motion to dismiss on speedy trial grounds. Contrary to his argument on appeal, the record shows the April 2018-filed motion to dismiss was Peacock's first assertion of his right to a speedy trial. Years earlier, in October 2012, Peacock's counsel stated that he was demanding trial in response to the State's request for a continuance to file its attenuation motion. However, defense counsel ultimately agreed to the continuance and did not persist in the trial demand. At every other appearance, Peacock either agreed to or requested continuances. After the denial of his motion to dismiss, Peacock asserted his speedy trial right again on October 5, 2018, when the court granted a continuance since a physician witness was unavailable. The jury trial commenced on the next date, November 13, 2018.

¶ 55       Peacock does not claim that any actual prejudice resulted. He simply relies on the length of the delay. This court has remarked, "[p]rotracted delay can make it unnecessary for a defendant to show actual prejudice." *People v. Singleton*, 278 Ill. App. 3d 296, 301 (1996). And we have found delays much shorter than 10 years presumptively prejudicial. See *id*. (collecting cases). However, we find those cases distinguishable.

¶ 56       In *Singleton*, the defendant was arrested more than four years after being indicted for a drug offense. *Id*. at 297. The State claimed he was a fugitive, yet the defendant was in custody on five different occasions after his indictment and was prosecuted on two different cases involving similar drug sales to the same undercover police officer. *Id*. at 297, 300. The court found the State's explanation was "woefully inadequate" and did not justify the delay.

¶ 57       Similarly, the defendant in *People v. Belcher*, 186 Ill. App. 3d 202, 203 (1989), was in IDOC custody for most of the more than two years between being charged and arrested. The defendant was unaware of the charges (*id*. at 207) and the State offered no explanation for the delay. *Id*. at 208.

¶ 58       The State, likewise, failed to justify a lengthy delay in arresting a defendant on drug charges when he could have been easily located in *People v. Yeager*, 84 Ill. App. 3d 415 (1980). In addition, the defendant asserted that the delay impaired his ability to prepare a defense as he could not remember the days of the alleged offenses three years before his arrest. The defendant in *People v. Nichols*, 60 Ill. App. 3d 919, 923-24 (1978) asserted her defense would be difficult to establish due to the passage of almost three years between the offense and her arrest. Like the defendant in *Yeager*, she was not difficult to locate, and the state's admitted "incompetence" was an insufficient excuse for the delay. *Id.* at 925.

¶ 59    In each of those cases, the reasons for the delay weighed so heavily against the State that prejudice was presumed. *Singleton*, 278 Ill. App. 3d at 301. Not so here. The State elected to proceed with Peacock's other case first. He filed motions to suppress that resulted in prolonging the litigation, which is not uncommon for such motions. And substantial portions of the delay were attributable to Peacock. In addition, Peacock was aware of the charges and does not assert that the delay impaired his ability to prepare for trial. We are also mindful that "abridgment of the right to a speedy trial may, at times, work to the advantage of the accused and against the State." *Crane*, 195 Ill. 2d at 47. Consequently, we do not presume he was prejudiced based solely of the length of the delay.

¶ 60    Balancing the four *Barker* factors, we do not find that Peacock's constitutional right to a speedy trial was violated. As we observed, the delay was regrettably long, but the reasons for it do not weigh heavily against the State, Peacock failed to assert his speedy trial right until filing his motion to dismiss in 2018, and he was not prejudiced by the delay.

¶ 61                    D. *De Facto* Life Sentence

¶ 62    Peacock was subject to a mandatory minimum prison term of 83 years: six years for each attempted murder, a 25-year firearm enhancement regarding Deniah, and 20-year firearm enhancements for Briscoe and Devon, all to be served consecutively due to the court's finding of severe bodily harm. The court imposed sentences that amounted to a total prison term of 93 years. In his motion requesting the court to reconsider the 93-year sentence, Peacock argued that the sentence was unconstitutional since he, as a young adult of age 23, was more like a juvenile and should be afforded an opportunity for release in his 50s or 60s. He contended the unsurvivable 93-year sentence deprived him of such an opportunity and was imposed without consideration of his youth. The trial court denied Peacock's motion, observing that the constitutional protection

regarding *de facto* life sentences had not been extended to persons who were legal adults at the time of their offense.

¶ 63    On appeal, Peacock renews his argument that he was given an unconstitutional *de facto* life sentence. Peacock points to authority requiring different sentencing considerations for adults and juveniles. See, *e.g.*, *Miller v. Alabama*, 567 U.S. 460, 471 (2012) ("children are constitutionally different from adults for purposes of sentencing."). In *Miller*, the United States Supreme Court held that sentencing a juvenile to mandatory life without the possibility for parole violates the eighth amendment to the United States Constitution. *Id.* at 479. The Court observed that juveniles have a "lack of maturity and an underdeveloped sense of responsibility," which leads to "recklessness, impulsivity, and heedless risk-taking." *Id.* at 471. Juveniles are also more vulnerable to negative influences and outside pressures, have limited control over their own environment, and "lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* The Court further reasoned that a juvenile's character is not as well-formed as an adult's. *Id.* A juvenile's traits are "less fixed," and their actions are "less likely to be evidence of irretrievable depravity." *Id.* Recognizing these attributes, the Court found that a mandatory sentence of life without the possibility of parole is disproportionate when applied to a juvenile since such a sentencing scheme precludes consideration of youth and its attendant characteristics. *Id.* at 476. The *Miller* decision did not categorically bar courts from sentencing juveniles to life imprisonment; it only required that the sentencing court consider the offender's youth and attendant characteristics before imposing such a penalty. *Id.* at 483.

¶ 64    Here, Peacock argues that the designation of adulthood beginning at age 18 is arbitrary and "emerging adults" like him should be afforded the protection that *Miller* and its progeny provide for juveniles. He asserts that neuroscience has shown brain development continues past age 18;

therefore, young adults, like juveniles, have a high capacity for reform and rehabilitation. Since the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) calls for penalties to include "the objective of restoring the offender to useful citizenship," Peacock contends sentences imposed on young adult offenders should afford a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," just as with juveniles. *Miller*, 567 U.S. at 479. He requests that we vacate his sentence and remand for a new sentencing hearing for the trial court to consider his youth and attendant circumstances and impose a sentence that would allow him "the opportunity to learn from his mistakes and eventually become a productive member of society."

¶ 65     In applying *Miller*, our supreme court has extended the protection to juveniles sentenced to mandatory prison terms so lengthy that the sentence amounts to the functional equivalent of life without parole, termed *de facto* life. *People v. Reyes*, 2016 IL 119271, ¶¶ 5, 9. The court also extended the protection to discretionary natural life or *de facto* life sentences. *People v. Holman*, 2017 IL 120655, ¶ 40. Later, the court resolved that a prison term constitutes *de facto* life if greater than 40 years. *People v. Buffer*, 2019 IL 122327, ¶ 40.

¶ 66     Thus far, neither the United States nor Illinois Supreme Courts have extended *Miller*'s reasoning to young adults. Indeed, our supreme court has expressly rejected that the eighth amendment protection articulated in *Miller* applies to persons who reached their 18th birthday prior to their offense. *People v. Harris*, 2018 IL 121932, ¶ 61. Nevertheless, the court left open the possibility that young adult offenders may be able to challenge their sentence on grounds comparable to *Miller* through an as-applied challenge under the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 46. To assert such claim, a defendant must present "evidence about how the evolving science on juvenile maturity and brain development that helped form the basis

for the *Miller* decision applies to defendant's specific facts and circumstances." *Id*. Basic information about a defendant, like that contained in a presentence investigation report, is insufficient. *Id*; see also *People v. House*, 2021 IL 125124, ¶¶ 29-32 (finding the record inadequate to conclude that 19-year-old offender's natural life sentence was unconstitutional; offender's age and limited role as an accomplice to a triple murder were insufficient to make an as-applied challenge).

¶ 67    The record from Peacock's sentencing hearing does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to his specific facts and circumstances. Instead, his postsentencing motion and appellate briefs largely make generic arguments that could be advanced by any young adult offender. And the few assertions specific to him merely repeat basic information contained in his presentence investigation report. Thus, with the record before us, we could not conclude that *Miller*-type reasoning applies to Peacock, rendering his sentence unconstitutional.

¶ 68    In addition, while this court has found that some young adult offenders were entitled to further postconviction proceedings to develop a record supporting their as-applied proportionate penalties challenges, such offenders were 18 or 19 years old when they committed their offenses. See, *e.g.*, *People v. Minniefield*, 2020 IL App (1st) 170541. By contrast, this court has generally found that defendants who were age 21 or over could not advance similar claims since "the line of adulthood has been drawn at age 21." *People v. Green*, 2022 IL App (1st) 200749, ¶ 42 (21-year-old offender); see also *People v. Humphrey*, 2020 IL App (1st) 172837 (21-year-old offender); *People v. Rivera*, 2020 IL App (1st) 171430 (23-year-old offender); *People v. Suggs*, 2020 IL App (2d) 170632 (23-year-old offender); but see *People v. Savage*, 2020 IL App (1st) 173135, ¶ 78 (21-year-old defendant made "arguable" claim to permit further proceeding when petition was

supported by evidence tending to show his lifelong drug addiction and mental health "rendered him functionally younger than his chronological age"). Thus, applying current law, we cannot consider Peacock a youthful offender.

¶ 69                                III. CONCLUSION

¶ 70            Based on the foregoing, we affirm the judgment of conviction and sentence.

¶ 71            Affirmed.